Good morning, Your Honors. Dana Duncan, representing Betty Brown. In the brief that's been submitted, there were three issues raised, but I'm going to boil it down to one specific issue, and it's a question of what is or is not the deferential standard that should be applied to administrative law. And in this particular case, we have three issues, obesity, the treating physician, and then the testimony of the vocational expert. And in each of these three situations, the ALJ, and I'll readily admit, did a very nice job of laying out the medical facts in his decision. The problem is is that when he came to the issue of obesity, he simply indicated, I have considered obesity at all stages without any further explanation, without any analysis. So the question is, when you're applying the deferential standard, is it one that it's enough that the ALJ says he considered it, or does there have to be proper analysis? It reminded me of the days when my kids were small, and they would try to negotiate their punishment, and I would say whatever their ask was is, well, consider it, right before I imposed whatever decision I already made. In this particular case, there's just nothing indicating actually what the ALJ did. The ALJ rejected part of the consultative examiner's opinions regarding light and medium work based on Brown's back impairment together with morbid obesity. Doesn't that indicate the ALJ actually weighed the effect of Brown's obesity? Well, it would be, Your Honor, if it actually showed that the state agency doctors or any of the consultative examiners even considered the obesity. If you look at the state agency opinions, record pages 204 and 215-16, it refers to what's called the EWS, the electronic worksheet. In both of those, all they did was mention the BMI. There's no analysis. They don't really say anything. They don't say how they considered it. And then, with regard to Dr. Rachis, there's no mention of obesity in his opinion at all, other than in the conclusion. That's record pages 1069-1074. If the ALJ wants to rely on medical opinions, he also ends up having to rely on opinions if they're not completely reliable. If the underlying decision is flawed, then his decision of relying upon him is equally flawed. On the treating physician, is there any objective evidence like scans or imaging indicating that Brown's nerve root or spinal cord were compromised? No. And really what we're talking about here is the difference between from here to here. The difference is she had, as he described, herniated discs noted on MRI in 2005. But when, and then he put her on this level of restrictions, there's only one answer. And I think the record is clear in his opinions, as well as the medical evidence. The difference is, is the claimant was weighing between 310 and 347 pounds at the time this was done. And case law in this circuit has said that, you know, when you have that kind of weight, that or exacerbates the pain. Social Security issued a ruling when they took obesity out of the listings. It used to be if you weighed a certain amount, you automatically qualified. But they took that out, issued a ruling and said, we're going to consider obesity among all the various aspects of the cases under orthopedic and under diabetic and all the other different things. Except it's gone to the other extreme, which is that obesity is almost never considered by anything. Or if it is, it's done in passing. Fancy. And so, in this particular case, that's the difference. And let me ask you this. Are you contending that the ALJ improperly rejected Dr. Shannon's opinion as to listing 1.04C? Or are you only concerned with his opinions about sitting, standing, rest time and absenteeism? I'm only considering the RFC, the residual functional capacity, but sitting, standing. And the reason is, is because a treating doctor in and of himself cannot opine on whether the listing is met or equal. That has to be an agency doctor to do that, to qualify. There could have been an issue raised as to whether, because he made that, that ALJ, as part of his duty to develop the record, should have called a medical expert to address that issue. But it wasn't done, and I didn't feel that that was the strongest point to go forward on. But it's in that area, with his opinions about sitting, standing and rest time, that you're saying he substituted the opinion of the treating doctor. Correct. What we're talking about here is, again, we're talking about Dr. Shannon's, what was a 10-year history of treating this claimant. And during this period of time, I believe I counted she was taking upwards of 12 OxyContin a day that he was prescribing. So obviously, if he's been treating her for this long and prescribing that level of narcotic pain medication, he believes there's probably a significant issue. Because a doctor is putting his own reputation, if not his license, on the line prescribing that level of medication for somebody who's just faking it or who is there seeking narcotics. So, in this case, I note too, the ALJ almost never mentions body mass index or weight. He just says he considered it. The commissioner's own brief waited until page 19 of the facts even mentioned the weight of the claimant. The commissioner says that the ALJ, when assessing the RFC, evaluated whether Brown's obesity exacerbated the limitations and caused her back impairment. Except that the standard is supposed to be whether you can trace the ALJ's path of reasoning. But I can't, for the life of me, after having read the decision now a dozen times or more, see where his path of reasoning is. I see his conclusion, but I certainly don't see the path that led to that conclusion. And that's ultimately the question of this. He also indicated that he considered, again, the consultative examiners, the medical records, the state agency doctors, but I indicated there's nothing conclusive in any of those that state obesity was actually considered or evaluated. Briefly, I just wanted to address the vocational expert issue as well. And that is, is clearly the vocational expert at hearing testified specifically that a sit-stand option and being off task was not contained in the dictionary of occupational titles. Under Overman, that issue has to be resolved. Under SSR 00-4P. And there were questions made about it, and the only information that the judge had was, in and of itself, her experience. But we have no idea what her experience is on those issues. So, if there are no questions, I'll reserve the remainder of my time for about it. Thank you, Mr. Duncan. Ms. Schwartz? Thank you. Good morning.  I'm Allison Schwartz, and I represent the Acting Commissioner of Social Security. I would like to address an item with respect to the obesity issue that Mr. Duncan raised. When Mr. Duncan was arguing, he mentioned that the consultative examiners and the state agency physicians did not appear to consider Ms. Brown's obesity. And I would like to point out that that is incorrect. The state agency doctors, there were two of them, diagnosed her with obesity. The first reference is on page 207 of the record. The second reference from the second doctor is on page 246. The consultative examiner also diagnosed her with obesity. And the ALJ evaluated the opinions of those medical sources. Well, did the ALJ expressly note which of Brown's conditions were caused or aggravated by obesity? Yes, he did, Your Honor. The ALJ noted at least twice in his decision that while Ms. Brown had mild to moderate examination findings and diagnostic images that were normal, her obesity, her extreme obesity, which he had referred to it, coupled with her back pain, warranted greater restrictions than those set forth in the three medical opinions. And thus, imposed a residual functional capacity finding of sedentary work with a sit-stand option. Now, the ALJ referenced daily activities such as cooking and childcare. Haven't we cautioned against equating these sorts of activities with the ability to work an eight hour day? Yes, you have, Your Honor. But in this particular case, the ALJ did not equate those abilities with the ability to work full time with an eight hour day. Rather, what the ALJ did, which has been affirmed by this court recently in both the Loveless case and the Alvarado case, was looked at the claims of disabling limitations. In this case, they were imposed by the doctor and compared those against her activities, which showed that she was walking daily, taking her children to the park every day, maintaining levels of activity with regard to walking every day. And found that based on that comparison, Ms. Brown was not as limited as Dr. Shannon had claimed. And so, he basically substituted his views for those of the treating physician, right? I mean, are you saying that Shannon's opinions lack corroboration or the opinions actually conflicted with the evidence? I'm saying that the ALJ actually credited Dr. Shannon's opinion more than he did any other opinion in the record. And cited the parts of Dr. Shannon's opinion, which the ALJ would rely on in his residual functional capacity assessment. However, certain of Dr. Shannon's limitations that related to sitting, standing, and needing multiple breaks per day, were not supported by his treatment notes, by Ms. Brown's statements to Dr. Shannon, by Ms. Brown's statements about her activities. As well as the neutral consultative examiner's exam and the diagnostic images. So for that reason, the ALJ undertook his burden under the regulations and the Social Security ruling and looked at all relevant evidence and determined the residual functional capacity that was fitting for Ms. Brown. But Ms. Schwartz, did he give reasons? Let's assume what you just said is accurate, that he looked at all that. But did he give his reasons why he deviated from Dr. Shannon's assessment? Yes, he did. He gave two primary reasons. And the first one was that Dr. Shannon's assessment as to the sitting, standing, and needing multiple breaks limitations were not supported by his own treatment notes. Which showed multiple things. It showed examinations from 2003 to 2014 that showed at most mild to moderate limitations in range of motion, normal gait, normal strength, and normal reflexes. As well as numerous representations in the record from Ms. Shannon herself that her medication helped her remain active and helped her control her pain. And so you're not disputing she was taking 12 OxyContin a day? To be honest, Your Honor, I don't know how many OxyContin she was taking per day. If that's what you're reading in the record, then I would not dispute that. I do know that she was on- Well, I'm trying to find it in the record count today. I don't know the dosage. OxyContin is extremely strong narcotic. That's true, Your Honor. I do know that she was on a pain contract with Dr. Shannon and was regulated. I do know that as the ALJ mentioned, the ALJ acknowledged that she was taking OxyContin. And that her dosage had to be increased from time to time. But that it helped her pain and allowed her to remain active and walk and exercise. And in fact, Dr. Shannon consistently encouraged her to lose weight and never discouraged her from maintaining activity. If I may, I would like to briefly return to the time I have left to the vocational expert testimony. Mr. Duncan mentioned- So when we look at, I mean, in the ALJ when he's talking about Shannon's report, he says, claimant would need frequent periods of walking and frequent periods of lying down during the day. She couldn't lift 10 pounds or more, occasionally less than 10. The reaching, pushing, pulling could aggravate the back condition.  So I am, like Judge Flom, trying to see why the ALJ just, what explanation the ALJ gave as to not crediting that and crediting what Shannon said. Well, there was nothing in Ms. Dr. Shannon's treatment notes which contained voluminous PERT accounts from Ms. Brown about her abilities that suggested that she needed to take multiple breaks throughout the day or that she had any issues with sitting. Rather, the treatment notes showed that she reported that she was able to maintain a consistent level of activity. And that when she overdid it, for example, if she walked two hours at a time, her pain would exacerbate and get worse. So the ALJ looked at over a decade of treatment notes and found that nothing in there suggested that she wasn't able to sit or to perform sedentary work, which were jobs that were almost all sitting with an ability to shift positions to sit, stand throughout the day. Now, I'd like to briefly just touch on the vocational expert testimony. Mr. Duncan mentioned that the vocational expert did not explain the bases for her testimony about a sit-stand option and a time off task, other than to note that it was just her experience. But I would like to correct Mr. Duncan and state that that's not true. The vocational expert mentioned that she had placed several people in jobs and provided specific examples of jobs that she placed people in that were seated. She also noted that with respect to the time off task, based on her experience, 98% of people were off task most of the day. And I would also like to just briefly touch on an argument raised in Mr. Duncan's brief about whether administrative law judges should have an obligation to delve deeper into testimony from a vocational expert that's uncontradicted at the hearing. And what the court should consider is what a reasonable rule is. And here, if we have Mr. Duncan, who was at the hearing below, if, as he did here, a claimant's attorney stipulates to a person who testifies as a vocational expert. And that attorney does not challenge the vocational expert's testimony at the hearing, then any subsequent challenge to that testimony should be waived. And the ALJ should not be faulted for not taking a deeper dive into the testimony. And that was the rule that this court imposed over a decade ago in Donahue. And it's a reasonable rule, and we believe that the court should reaffirm it. And if the court has no further questions. Thank you. Thank you. Mr. Dunn? The Donahue issue is to the numbers. It does not pertain to conflicts. Conflicts are not waived by failure to cross-examine an adherent under Overman. So that's not a completely accurate statement. In this case, again, we're talking about the doctor's treatment notes. But yet he doesn't, the ALJ doesn't spend any time going through the treatment notes and showing exactly where there is the conflict, where is the problem, where is it that his notes do not match up with what his findings are. And I can't find anywhere where he explains how other experts' testimony were more reliable, or any reference to the treatment notes. No. Where there were over a dozen individualized assessments and repeated references to chronic pain. Correct. And moreover, the claimant's testimony, unlike in a lot of hearings, this was the fourth go-round. There were three previous decisions. One that was not appealed, then there was one issued by Judge Zellman, then a previous one by Judge Ploys. So he had the benefit of having all of the claimant's testimony over four hearings. The transcript would have been available to see exactly what she was talking about for limitations. She talked about being unable to even pick up a gallon of milk due to pain. She had difficulty. In 2006, she had been walking and apparently exacerbated her condition and ended up in a worse situation, which is then where the disability claim was filed. Counsel, what was the dosage of that OxyContin, do you know? I don't have it. I was looking for it, Judge. The only reference I have in my notes, and I apologize, is that as of 2006, she was taking 40 milligrams in the morning, and then 20 milligrams three more times. The other thing I can indicate is that I did talk with the claimant just last night about her condition, and she's still treating. She did have a gastric bypass. That's 100 milligrams a day, right? She indicated that she's taking heavy doses, and I had a number of, or that she was taking more than a dozen in her testimony last night. Because they can come in 5 milligram or 10 milligram capsules. And 3 milligrams. And 3 milligram, yeah. But actually, it's page 240 of the, I think it's 240 of the record, indicated that she was taking, yeah, 240 of the record. She was taking 40 milligrams in the morning and 20 milligrams three times a day in addition. So, all right. Thank you. Thank you, Your Honor. Thank you, Ms. Schwartz. The case is taken under advisement.